**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

COLORADO FIREARMS, AMMUNITION AND ACCESSORIES, LLC d/b/a CEN-TENNIAL GUN CLUB, a Colorado limited liability company; AMERICAN HUNT-ING & FIREARMS SERVICE, LLC d/b/a SALIDA GUNSHOP, a Colorado limited liability company; THE LEADVILLE ARMORY, LLC, a Colorado limited liability company; COLORADO STATE SHOOTING ASSOCIATION, a Colorado nonprofit corporation; and COLORADO FEDERAL FIREARMS LICENSEE ASSOCIATION, a Colorado nonprofit corporation,

 *Plaintiffs*,

v.

JARED POLIS, in his official capacity as Governor of the State of Colorado; PHILIP WEISER, in his official capacity as Attorney General of the State of Colorado; and HEIDI HUMPHREYS, in her official capacity as the Executive Director of the Colorado Department of Revenue,

 *Defendants*.

---

## COMPLAINT

---

Plaintiffs file this complaint seeking declaratory relief and a permanent injunction enjoining the enforcement of Colorado's warrantless-inspection scheme in Colorado House Bill 26-1126 (HB 26-1126) (codified in Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403), and allege:

### Nature of the Case

1. This is a civil rights lawsuit challenging the constitutionality of Colorado's warrantless-inspection scheme for firearms dealers under the Fourth Amendment to the U.S. Constitution and article II, section 7 of the Colorado Constitution. Contrary to blackletter law requiring warrants for government searches, HB 26-1126

empowers any "duly authorized peace officer" in the state to demand inspection of a licensed firearms dealer's records "at all times" without prior notice, without a warrant, without reasonable suspicion, without temporal limitations, without frequency restrictions, and without any constraint on which "peace officers" may conduct such an inspection. Governor Jared Polis signed HB 26-1126 into law on June 2, 2026.

2.      The Fourth Amendment to the Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This right applies with full force to commercial premises. *See v. City of Seattle*, 387 U.S. 541, 543 (1967).

3.      The Colorado Constitution uses similar language to the Fourth Amendment and protects Coloradans' "legitimate expectation of privacy from unreasonable government intrusions." *People v. Sporleder*, 666 P.2d 135, 139 (Colo. 1983). Colorado courts also apply this right to commercial premises. *See Maralex Res., Inc. v. Colo. Oil & Gas Conservation Comm'n*, 428 P.3d 657, 662–65 (Colo. 2018) (applying the federal standard discussed below to closely regulated industries in Colorado).

4.      Plaintiffs are firearms dealers and organizations gravely threatened by Colorado's statutory scheme authorizing searches of firearms businesses—without a warrant—and without any meaningful limitations on the search. The Fourth Amendment and Colorado Constitution forbid such unchecked governmental power. The right to be free from unrestrained government search dates to the American Declaration of Independence and the abuse of general warrants. For over a century, the U.S. Supreme Court has recognized that "constitutional provisions for the security of person and property should be liberally construed" and "it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635 (1886).

5.      Importantly, the Fourth Amendment broadly protects businesses from warrantless searches, including businesses engaged in commerce with customers who exercise no independent constitutional rights. As recently as 2015, the Supreme Court held that a California ordinance for warrantless searches of hotel records violated the Fourth Amendment. *City of Los Angeles v. Patel*, 576 U.S. 409, 428 (2015).

6.      The Tenth Circuit likewise long ago struck down a functionally similar inspection statute that lacked standards in *V-1 Oil Co. v. Wyo. Dep't of Env't Quality*, 902 F.2d 1482 (10th Cir. 1990). There, the court invalidated a Wyoming statute authorizing warrantless inspections because it provided "no notice" to property owners, gave "no assurance of regularity of inspections," and contained no limitations on time, place, or scope. *Id.* at 1487. Colorado's new statute suffers from the same infirmities.

7.      HB 26-1126's warrantless-inspection scheme poses a major ongoing constitutional concern. Under state law, a dealer who "refuses to exhibit the record when requested by a peace officer" commits a class 2 misdemeanor. Colo. Rev. Stat. § 18-12-403. Dealers are left with an impossible choice: submit to unconstitutional searches or face criminal prosecution with no opportunity to seek judicial review before being charged for noncompliance.

8.      Plaintiffs are firearms dealers and organizations in Colorado. They bring this facial challenge to the constitutionality of HB 26-1126's warrantless-inspection provisions, specifically Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403, which authorize searches that violate the Fourth Amendment to the U.S. Constitution, *see Patel*, 576 U.S. at 415–16 (allowing facial Fourth Amendment challenges to statutes authorizing warrantless searches), and article II, section 7 of the Colorado Constitution, *see Maralex Res.*, 428 P.3d at 662–65.

3

9.     The Court should declare the inspection provisions in Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403, unconstitutional and enjoin their enforcement.

### Jurisdiction & Venue

10.     Plaintiffs seek to vindicate their rights under the U.S. Constitution under 42 U.S.C. § 1983, the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1988, for attorneys' fees, and under article II, section 7 of the Colorado Constitution.

11.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. § 1983.

12.     This Court has supplemental jurisdiction over Plaintiffs' claims under the Colorado Constitution under 28 U.S.C. § 1367.

13.     Venue is proper in this Court under 28 U.S.C. § 1391, because, among other things, the challenged statutory provisions operate and are enforced throughout the District of Colorado, Defendants perform their official duties within this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur within this District.

### Parties

14.     Plaintiff Colorado Firearms, Ammunition and Accessories, LLC d/b/a Centennial Gun Club is a Colorado limited liability company with its principal place of business at 11800 E. Peakview Avenue, Centennial, Colorado 80111. Centennial Gun Club has held a valid federal firearms license issued by the Alcohol, Tobacco, Firearms and Explosives (ATF) since 2021, and a valid state dealer permit since 2025.[1] Centennial Gun Club is engaged in the retail sale, rental, exchange, and

---

[1] Colorado required firearms dealers to obtain state permits to transfer firearms beginning on July 1, 2025. *See* Colo. Rev. Stat. § 18-12-401.5(1)(a). Each plaintiff firearms dealer in this action obtained its state permit on July 1, 2025.

transfer of firearms in the state of Colorado, and is subject to HB 26-1126's record-inspection requirements in Colo. Rev. Stat. § 18-12-402.

15. Plaintiff American Hunting and Firearms Service, LLC d/b/a Salida Gunshop is a Colorado limited liability company with its principal place of business at 7345 W U.S. Highway 50, Salida, Colorado 81201. Salida Gunshop has held a valid federal firearms license issued by the ATF since 2013, and a valid state dealer permit since 2025. Salida Gunshop is engaged in the retail sale, rental, exchange, and transfer of firearms in the state of Colorado, and is subject to HB 26-1126's record-inspection requirements in Colo. Rev. Stat. § 18-12-402.

16. Plaintiff The Leadville Armory, LLC is a Colorado limited liability company with its principal place of business at 401 W. 3rd Street, Leadville, Colorado 80461. The Leadville Armory has held a valid federal firearms license for fifteen years and a valid state dealer permit since 2025. The Leadville Armory engages in transfers of firearms in the state of Colorado, and it is subject to HB 26-1126's record-inspection requirements in Colo. Rev. Stat. § 18-12-402.

17. Plaintiff Colorado State Shooting Association (CSSA) is a Colorado nonprofit corporation with a principal place of business in Colorado. CSSA is the official state association of the National Rifle Association, and its members own, operate, and purchase firearms from state-permitted firearms dealers subject to HB 26-1126's record-inspection requirements in Colo. Rev. Stat. § 18-12-402.

18. Plaintiff Colorado Federal Firearms Licensee Association (CFFLA) is a Colorado nonprofit corporation with a principal place of business in Colorado. CFFLA was founded in 2024, as a unified body for each of the state's FFL dealers. CFFLA's members are federally licensed firearms dealers and include state-permitted firearms dealers subject to the requirements in Colo. Rev. Stat. § 18-12-402.

19.    Defendant Jared Polis is the Governor of the State of Colorado. Governor Polis signed HB 26-1126 into law on June 2, 2026. As Governor, Defendant Polis is the chief executive officer of the state and is responsible for the faithful execution of the laws of the State. Governor Polis is sued in his official capacity only.

20.    Defendant Philip Weiser is the Attorney General of the State of Colorado. As Attorney General, Defendant Weiser is the chief law enforcement officer of the state and is a peace officer under Colorado statute, *see* Colo. Rev. Stat. § 16-2.5-128. Attorney General Weiser is sued in his official capacity only.

21.    Defendant Heidi Humphreys is the Executive Director of the Colorado Department of Revenue, which is responsible for issuing firearm dealer permits and enforcing permit requirements. *See* Colo. Rev. Stat. §§ 18-12-401–401.5. As the Department's Executive Director, Defendant Humphreys is the primary executive responsible for executing state laws governing firearm-dealer permits. Executive Director Humphreys is sued in her official capacity only.

22.    Plaintiffs sue each Defendant in their official capacities for prospective, non-monetary relief for ongoing, continuing, and repetitive violations of federal law. At all times, Defendants acted under color of state law that has caused the deprivation of Plaintiffs' constitutional rights and, therefore, Defendants are not immune from this lawsuit. *Ex parte Young*, 209 U.S. 123, 161 (1908).

## Constitutional & Statutory Background

### *Constitutional Protections Against Unreasonable Searches*

23.    The Fourth Amendment to the U.S. Constitution, applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

24. The Fourth Amendment stands as the cornerstone of individual liberty, *see Byrd v. United States*, 584 U.S. 395, 402–03 (2018), was meant to "place obstacles in the way of [the government]," *Carpenter v. United States*, 585 U.S. 296, 305 (2018), and "gives concrete expression to a right of the people which 'is basic to a free society,'" *Camara v. Mun. Ct.*, 387 U.S. 523, 528 (1967) (quoting *Wolf v. Colorado*, 338 U.S. 25, 27 (1949)). It protects against "unwarranted intrusion[s]," *Winston v. Lee*, 470 U.S. 753, 760 (1985), "arbitrary invasions," *Camara*, 387 U.S. at 528, and "all general searches," *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931), by the government. Its primary purpose was to forever stamp out the suspicionless search. *See Boyd v. United States*, 116 U.S. 616, 625–30 (1886).

25. Indeed, the Fourth Amendment was the Framers' response to the "widespread hostility among the former colonists to the issuance of writs of assistance empowering revenue officers to search suspected places for smuggled goods, and general search warrants[.]" *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990). General warrants did not identify the person or place to be searched; and writs of assistance gave customs agents "carte blanche" access to homes, warehouses, and all persons, papers, and effects therein, forced individuals to "assist" in the searches, and violated "the oldest of English rights: that of a person to be secure in his home." Laura K. Donohoe, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1242–44 (2016). It was those warrantless, suspicionless searches that the patriot James Otis railed against in *Paxton's Case* in 1761, "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country,"

*Boyd*, 116 U.S. at 625, and "helped spark the Revolution itself," *Carpenter*, 585 U.S. at 303–04 (cleaned up).

26.     The Fourth Amendment's protections extend to—among many other things—homes and their curtilage, *Florida v. Jardines*, 569 U.S. 1, 6 (2013), commercial premises, *See v. City of Seattle*, 387 U.S. 541, 543 (1967), and business records, *City of Los Angeles v. Patel*, 576 U.S. 409 (2015).

27.     Thus, a government inspection of commercial premises constitutes a "search" within the meaning of the Fourth Amendment. *See*, 387 U.S. at 543; *Camara*, 387 U.S. at 523.

28.     Warrantless searches are per se unreasonable unless they fall within a recognized exception to the warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). One such exception permits warrantless inspections of "closely regulated" industries, but only when the regulatory inspection scheme satisfies stringent constitutional conditions. *See New York v. Burger*, 482 U.S. 691, 702–03 (1987).

### *Administrative Inspections of Closely Regulated Industries*

29.     While the U.S. Supreme Court has recognized a narrow exception permitting warrantless inspections of "closely regulated" industries, that exception demands meaningful constitutional safeguards. *See id.* The inspection statute must provide a "constitutionally adequate substitute for a warrant"—one that advises the business owner that inspections are conducted pursuant to law, defines their regularity and scope, and constrains the inspecting officer's discretion to protect against abuse. *Id.* at 703.

30.     HB 26-1126 does not even try to comply with the *Burger* requirements, and its warrantless-inspection provisions are the antithesis of the carefully circumscribed regimes the Supreme Court and the Tenth Circuit have upheld. The statute

provides no notice of regularity, empowers an overbroad class of inspectors with no nexus to firearms regulation, imposes no temporal or frequency limitations, and places no restrictions on the manner of inspections.

31. The contrast with the federal firearms-inspection framework could not be starker. Under 18 U.S.C. § 923(g), compliance inspections of federally licensed firearms dealers may be conducted only by the U.S. Attorney General's designated agents (in practice, the Bureau of Alcohol, Tobacco, Firearms and Explosives), only during business hours, and no more than once in any 12-month period, absent meeting narrow statutory exceptions. For cause-based inspections, the federal government must obtain a warrant. Colorado's regime contains none of these safeguards.

32. Under *Burger*, "warrantless inspection[s] … in the context of a pervasively regulated business[] will be deemed to be reasonable only so long as three criteria are met." *Id.* at 702. *First*, "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id. Second*, "the warrantless inspections must be 'necessary to further [the] regulatory scheme.'" *Id.* (quoting *Donovan v. Dewey*, 452 U.S. 594, 600 (1981)). *Third*, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Id.* at 703 (quoting *Donovan*, 452 U.S. at 603); *Johnson v. Smith*, 104 F.4th 153, 159 (10th Cir. 2024).

33. To satisfy *Burger*'s third requirement, "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* "To perform this first function, the statute must be 'sufficiently comprehensive and defined that

9

the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'" *Id.* Further, "in defining how a statute limits the discretion of the inspectors, [the Supreme Court has] observed that it must be 'carefully limited in time, place, and scope.'" *Id.* (quoting *United States v. Biswell,* 406 U.S. 311, 315 (1972)).

34.    In *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), which addressed the constitutionality of warrantless inspections of Los Angeles hotel records, "the Supreme Court again addressed the closely-regulated-industry exception …, this time emphasizing the limits to the exception." *See Johnson,* 104 F.4th at 165. Finding the inspection scheme failed *Burger*'s second and third prongs, the Court first held that warrantless inspections were unnecessary because officers could conduct surprise inspections through *ex parte* warrants, and the required registries could be monitored pending a hearing on any motion to quash. *Patel*, 576 U.S. at 427 (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978)).

35.    Equally problematic in *Patel* was that the statute "fail[ed] sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances." *Id.* Although the Court previously upheld inspection schemes that called for searches "at least four times a year" or on a "regular basis," the ordinance at issue in *Patel* imposed no standard at all. *Id.* at 427–28. The statute was thus "facially invalid" because it "failed to provide any opportunity for precompliance review before a hotel must give its guest registry to the police for inspection." *Id.* at 428.

***Colorado's Firearm Dealer Regulatory Framework***

36.    As of 2025, Colorado joined the minority of states with laws requiring any person engaged in the business of dealing in firearms to obtain a state permit. Colo. Rev. Stat. § 18-12-401.5(1)(a).

37.    To obtain the required state permit from the Colorado Department of Revenue, a dealer must hold a valid federal firearms license and must not have had a license or permit revoked, suspended, or denied for good cause within three years of application. § 18-12-401.5(3). A dealer and each "responsible person" of the dealer must not have been convicted of any firearms violation within three years prior to application. *Id.*

38.    Adopted just one year later, HB 26-1126 requires every dealer engaged in retail firearms transactions to "keep a record of each firearm transaction conducted by the dealer." § 18-12-402(1). The record must include: (1) the name of the person who received the firearm and the recipient's age and address; (2) the make, caliber, and finish of the firearm; (3) the firearm's serial number, if any; (4) the date of the transaction; and (5) the name of the employee who conducted the transaction. § 18-12-402(2). Records may be maintained in a book or electronic record. § 18-12-402(1).

### Colorado's Warrantless-Inspection Scheme

39.    HB 26-1126 authorizes Colorado "peace officers" to inspect dealers' records without a warrant. The inspection scheme is largely undefined, and it imposes few constraints on state inspectors' discretion or on the time, place, and scope of state inspections of firearms dealers.

40.    *No Temporal Limitations.* HB 26-1126 requires dealers to make their records available for inspection "at all times." § 18-12-402(3). The statute contains no requirement that inspections occur during business hours, or during any defined period for that matter.

41.    *No Frequency Constraints.* HB 26-1126 sets no frequency limitations on the number of state inspections a dealer is subject to. The statute grants peace officers discretion to inspect a firearm dealer's records and the private information of

a dealer's customers as often as the officer wishes. The statute also imposes no requirement that peace officers coordinate inspections with any state agency, such as the Department of Revenue, which regulates firearms dealers, to protect against abuse of the warrantless-inspection scheme.

42. ***No Defined Scope or Purpose.*** HB 26-1126 identifies no purpose for firearm dealer inspections and fails to limit state officials' inspection authority. Under this warrantless-inspection scheme, state officials may inspect dealers' records for any reason—or no reason at all. Further, the statute places no constraints on the inspector's discretion regarding which dealer to inspect or under what circumstances.

43. ***No Pre-compliance Review.*** HB 26-1126 establishes no pre-compliance review mechanisms. The statute does not require inspecting officers to obtain any form of pre-inspection authorization, and dealers cannot challenge the reasonableness of an inspection demand before the threat of criminal prosecution forces them to submit.

44. ***Overbroad Class of Inspectors.*** HB 26-1126 empowers any "duly authorized peace officer" to inspect a firearms dealer. § 18-12-402(3). Under Colorado law, "peace officer" includes numerous categories of state and local officials, including port of entry officers, state brand inspectors, Colorado national guardsmen, and the director of racing events. *See* §§ 16-2.5-100.3–153. Peace officers may conduct inspections even if they have no firearms training, no familiarity with firearms dealer recordkeeping requirements, and no regulatory-enforcement connection to the firearms industry.

45. ***Criminal Penalties for Failure to Comply.*** A dealer's refusal to participate in an inspection on demand amounts to a class 2 misdemeanor. § 18-12-403. Dealers are thus compelled to submit to inspection or risk criminal prosecution.

*The Federal-Inspection Framework and Comparison*

46.    The federal Gun Control Act, 18 U.S.C. § 923(g), provides a comprehensive and constitutionally adequate framework for inspecting federally licensed firearms dealers. That framework includes the limitations outlined in paragraphs 47 to 53, each of which is absent from Colorado's scheme.

47.    ***Authorized Inspectors.*** Under federal law, only "the Attorney General" or designated agents—in practice, trained ATF investigators with specialized knowledge of firearms regulations—may conduct inspections. § 923(g)(1)(A). Colorado authorizes any "duly authorized peace officer" to conduct inspections—a category encompassing officers with no specialized firearms-regulation training, from student-loan investigators to coroners to town marshals.

48.    ***Temporal Limitation.*** Federal law limits inspections to "business hours." § 923(g)(1)(A). Colorado's statute permits inspections "at all times."

49.    ***Frequency Limitation.*** Federal law limits compliance inspections to "not more than once during any 12-month period," except under narrow circumstances specifically outlined in the statute. § 923(g)(1)(B)(ii)(I). Colorado imposes no frequency limitation whatsoever.

50.    ***Purpose Limitation.*** Federal law specifies that inspections are for "ensuring compliance with the record keeping requirements." 18 U.S.C. § 923(g)(1)(B). Colorado's statute states no purpose. This is particularly problematic as the information available through the warrantless inspection is information that personally identifies the dealers' customers, including their names and addresses.

51.    In fact, HB 26-1126 tacitly acknowledges the concern that the state might skirt warrant requirements to access customers' transaction data by prohibiting the department or "any other state agency" from "creat[ing] or maintain[ing] a

registry identifying firearm ownership." Colo. Rev. Stat. § 18-12-402(4). While state agencies may be prohibited from creating databases with customer information, the state government can, ad hoc, collect the same constitutionally sensitive data without a warrant because of the absence of a purpose limitation.

52.    ***Warrant Requirement.*** Federal law requires a warrant supported by reasonable cause when an inspection is based on a belief that a violation has occurred. 18 U.S.C. § 923(g)(1)(A). Colorado requires no warrant under any circumstances.

53.    The existence of this comprehensive federal framework, which the Supreme Court upheld in *United States v. Biswell*, 406 U.S. 311 (1972), as a constitutionally sufficient means of regulating firearms dealers, underscores the absence of necessity for Colorado's far more intrusive and standardless regime.

54.    The distinctions between the federal and the state inspection schemes are summarized in the following table:

| Federal-Inspection Framework | Colorado Warrantless-Inspection Scheme |
|---|---|
| **Limited Authorized Inspectors:** Inspections are conducted by the Attorney General or designated agents, i.e., trained ATF investigators. 18 U.S.C. § 923(g)(1)(A). | **Overbroad Class of Inspectors:** Colorado allows any "duly authorized peace officer" to inspect dealer records. Colo. Rev. Stat. § 18-12-402(3). **Constitutional Deficiency:** Colorado broadly defines its inspecting officers. |
| **Temporal Limitation:** Federal inspections are limited to "business hours." 18 U.S.C. § 923(g)(1)(A). | **No Temporal Limitations:** Colorado requires records to be available "at all times." Colo. Rev. Stat. § 18-12-402(3). **Constitutional Deficiency:** Colorado inspections are not constrained by time and permit more intrusive, less predictable access. |

14

| Frequency Limitation: | No Frequency Constraints: |
|---|---|
| Federal compliance inspections are generally limited to once every 12 months. 18 U.S.C. § 923(g)(1)(B)(ii)(I). | Colorado imposes no limit on how often officers may inspect dealer records. |
| | **Constitutional Deficiency:** |
| | Colorado allows repeated access without any frequency safeguard. |
| **Purpose Limitation:** | **No Defined Scope or Purpose:** |
| Federal inspections are limited to ensuring compliance with recordkeeping requirements. 18 U.S.C. § 923(g)(1)(B). | Colorado states no inspection purpose or scope limit. Colo. Rev. Stat. § 18-12-402(3). |
| | **Constitutional Deficiency:** |
| | Colorado provides no limit on the scope of an officer's inspection. |
| **Warrant Requirement:** | **No Warrant or Adequate Substitute:** |
| Federal law requires a warrant supported by reasonable cause when an inspection is violation-based. 18 U.S.C. § 923(g)(1)(A). | Colorado's unconstrained inspections require no third-party review and lack time, place, and scope limitations. |
| | **Constitutional Deficiency:** |
| | Colorado lacks judicial review or substitute before customer records are exposed. |
| **Criminal Penalties:** | **Criminal Penalties for Failure to Comply:** |
| Federal penalties operate within defined limits on inspector identity, timing, frequency, purpose, and warrants. | Refusal to comply is a class 2 misdemeanor. Colo. Rev. Stat. § 18-12-403. |
| | **Constitutional Deficiency:** |
| | Substantial punitive threat with no meaningful review. |

## Factual Background & Allegations

### *Centennial Gun Club*

55.    Centennial Gun Club is a federally licensed and state-permitted firearms dealer in Centennial, Colorado.

56.    At its location, CGC operates a retail firearms and accessory shop, offers gunsmithing services, runs a firearms range, and provides numerous training options specifically designed to help individuals safely and skillfully employ their rifles, shotguns, and handguns.

15

57.     Centennial Gun Club has been serving the Denver-metro area for fourteen years. Centennial Gun Club strives to serve as an all-in-one location where a person can find the firearm for their needs, train to proficiently use that firearm, and maintain their skills so that they can be safe and capable firearm owners.

58.     To achieve this goal, Centennial Gun Club offers membership programs that provide unlimited range time for proficiency shooting and discounts on equipment and training. Individuals, however, need not be members to take advantage of Centennial Gun Club's benefits; the club is open to the general public.

59.     Centennial Gun Club's retail firearms shop conducts thousands of firearms sales transactions each year. In fact, the club believes that it is one of the largest locally owned firearms dealers in Colorado.

60.     In 2021, after a change in ownership, the club applied for and received a new federal firearms license. The club has maintained its FFL for five years.

*Recent Federal and State Inspections*

61.     Because it holds a federal firearms license, ATF periodically inspects Centennial Gun Club's firearm transaction records.

62.     These federal inspections ensure the club's records comply with federal recordkeeping requirements.

63.     Centennial Gun Club's last federal inspection occurred on November 4, 2025. The federal inspectors found no violations of the federal recordkeeping requirements; Centennial Gun Club is fully compliant with federal law.

64.     In addition to its federal license, Centennial Gun Club maintains a state-required firearm dealer permit and has done so since July 1, 2025, when the state first imposed its licensing requirement.

16

65.    As a state-permitted firearm dealer, Centennial Gun Club faces inspections from Colorado officials in addition to its periodic federal inspections.

66.    Centennial Gun Club's last state inspection was on February 12, 2026. During the inspection, officials from the Colorado Department of Revenue's Firearms Dealer Division reviewed Centennial Gun Club's inventory, firearm transaction record books, and employee information.

67.    After their inspection, inspectors found no violations of state record-keeping requirements; Centennial Gun Club is fully compliant with Colorado law.

### *Impact of HB 26-1126 on Centennial Gun Club and its Customers*

68.    Since the state imposed its own licensing and recordkeeping scheme, Centennial Gun Club's customers have grown increasingly intimidated and paranoid about sharing personal information with the club.

69.    State forms require firearms purchasers to provide information beyond that required by statute, and customers commonly express concern over the personal nature of the information collected. For example, customers repeatedly ask Centennial Gun Club why the state needs to know their occupation.

70.    On at least one occasion, a customer initiated the firearms purchase process, expressed significant concern about the amount of detailed, private information that the state was demanding of him, and he left the store without completing his purchase.

71.    Centennial Gun Club has no way of knowing precisely how many firearm sales it has lost from law-abiding citizens simply deciding not to provide personal information for state officials to repeatedly inspect without limit.

17

72. Further, Centennial Gun Club knows of no way to appeal an unreasonable inspection. Without this ability, Centennial Gun Club cannot shield private customer information from unreasonable warrantless searches.

73. Under HB 26-1126, all "peace officers" may inspect Centennial Gun Club without notice at any time, without reason. The law imposes no limit on the number of times Centennial Gun Club may be subject to such inspections or what the officers may review.

74. Currently, Centennial Gun Club employees know of no way to appeal or complain about an inspection that they believe may be unreasonable, invasive, or harassing. Even if they did, the risk of criminal prosecution is too high for Centennial Gun Club to refuse an unreasonable, and constitutionally unlawful, search.

### *Salida Gunshop*

75. Salida Gunshop is a federally licensed and state-permitted gun dealer located in Salida, Colorado.

76. Salida Gunshop operates a retail firearm shop with potentially unmatched inventory for rural Colorado, and it provides training for concealed handgun permits, firearm refresher courses, self-defense instruction (both with and without firearms), and numerous other training programs for safe firearm use.

77. The shop seeks to ensure that firearm owners become and remain proficient and safe firearm users, benefiting themselves and their communities.

78. Salida Gunshop has been serving Salida and the surrounding rural communities for 13 years, but its impact extends beyond firearms sales and instruction. Over the years, the owners of Salida Gunshop have become increasingly concerned with a growing epidemic of suicide among Colorado's rural, agricultural communities. To raise awareness of the suicide crisis and to provide resources to combat it, Salida

18

Gunshop has partnered with the University of Colorado Anschutz and participated in the Department of Public Health and Environment's Gun Shop Project to focus on advancing healthcare through safe and responsible gun practices and storage.

79.    Salida Gunshop has also advanced various efforts benefiting Coloradans through its partnerships with the Colorado Cattlemen's Association, Coloradans for Responsible Wildlife Management, and numerous other groups.

80.    Salida Gunshop actively educates Coloradans on firearms, gear, and protection techniques; promotes discussion about responsible hunting, wildlife management, and other aspects of rural Colorado; engages with key individuals and policymakers throughout the state; and addresses firearm policy to ensure that Colorado firearm owners remain aware of policy changes.

*Recent Federal and State Inspections*

81.    As a federally licensed firearms dealer, ATF officials periodically inspect Salida Gunshop.

82.    Salida Gunshop's most recent federal inspection was on August 11, 2022. The inspection lasted for four hours, and the ATF officials reviewed the shop's inventory and transactional records.

83.    The federal investigators found no violations. Salida Gunshop is fully compliant with federal law.

84.    Like Centennial Gun Club, Salida Gunshop also faces additional state inspections.

85.    Salida Gunshop's last state inspection was in January 2026, and was conducted by inspectors from the Colorado Department of Revenue's Firearms Dealer Division.

19

86.    State officials inspected Salida Gunshop's premises, inventory, and transactional and employment records. Following the inspection, the inspectors issued a variance related to the shop's bolt-action rifle storage and completed their inspection. The shop received no violations and is fully compliant with Colorado law.

*Impact of HB 26-1126 on Salida Gunshop*

87.    Salida Gunshop is concerned about the negative impact that HB 26-1126 has already had on the shop and on firearms dealers throughout the state.

88.    Over the past six years, Salida Gunshop's customer base has swelled significantly. These customers regularly engage with Salida Gunshop and express concern over increasing state law restrictions on firearms.

89.    Salida Gunshop worries about the lack of safeguards in HB 26-1126 for firearms dealers, and it believes that the law, with few limits on inspector discretion and the prospect of criminal prosecution against dealers, will become so burdensome on Colorado firearms dealers that it will drive many out of business.

**The Leadville Armory**

90.    The Leadville Armory is a federally licensed and state-permitted firearm dealer located in Leadville, Colorado.

91.    The Leadville Armory is a home-based dealer. The owner, who is a firefighter in the Vail Valley, is the only employee of the business and completes firearms transfers from the living room of his home.

92.    The Leadville Armory's owner engages actively in Colorado policy discussions related to firearms; he regularly testifies on proposed legislation and the impact that it will have on dealers and their customers.

93.    The Leadville Armory has maintained an active FFL for fifteen years.

*Recent Federal and State Inspections*

94.     As a federally licensed firearms dealer, The Leadville Armory is subject to periodic inspections by ATF officials.

95.     The Leadville Armory's last federal inspection occurred nine years ago. During the inspection, the federal inspectors reviewed The Leadville Armory's transaction records and identified discrete violations that were promptly remediated. The armory is fully compliant with federal law.

96.     As a state-permitted firearms dealer, The Leadville Armory also faces additional state inspections.

*Impact of HB 26-1126 on The Leadville Armory*

97.     The Leadville Armory worries about its ability to remain in business with the passage of HB 26-1126.

98.     The armory's owner is the business's only employee, and his firefighting duties require his sole attention for significant portions of the year. His firefighting shifts require him to be present at the fire station on a two-days-on, four-days-off schedule. Should state inspectors demand to inspect The Leadville Armory's records while its owner is away, the owner would be unable to comply and would potentially be subject to criminal prosecution.

99.     In addition, local and state laws have already made it difficult for the owner to comply with the requirements of maintaining a firearms dealer business, despite the armory's full compliance with federal law. The Leadville Armory remains apprehensive about what appears to be a bleak business outlook should the HB 26-1126 warrantless-inspection regime remain in place.

***Colorado State Shooting Association***

100.    The Colorado State Shooting Association is the official state association of the National Rifle Association (NRA).

101.    CSSA's mission is to "advance, preserve, and exercise the natural right of gun ownership by Coloradans."[2]

102.    CSSA is the leading organization that champions the interests of firearms dealers and owners in the State of Colorado. The association does so in several ways. *First*, CSSA operates as the sanctioning body of all official NRA firearms matches in Colorado. *Second*, the association serves as a central hub that educates and informs Coloradans about clubs, firing ranges, matches, gun shows, and firearms-related statutes, regulations, and legislation. *Third*, CSSA advances the interests of its members that are Colorado firearms dealers and owners.

103.    Since 1976, CSSA has continually served and advocated for the interests of firearms dealers and owners in Colorado.

*Impact of HB 26-1126 on CSSA*

104.    Many of CSSA's members are federally licensed and state-permitted firearms dealers. In fact, CSSA has a special membership category for businesses in the firearms industry, including FFLs.

105.    These members have voiced growing concern over HB 26-1126's warrantless-inspection scheme and its enforcement.

106.    Specifically, members that are firearms dealers are concerned that a broad range of inspectors who may have no connection to the firearms industry and

---

[2] *Colorado State Shooting Association*, https://bit.ly/4epEGiF (last visited June 12, 2026).

may not be familiar with firearms regulation will have the authority to inspect their businesses and potentially subject them to criminal prosecution.

107. The inspectors arriving to inspect CSSA's dealers need not provide prior notice, may call for inspections anywhere and at any time, and can inspect and re-inspect the dealers without limit.

108. HB 26-1126's onerous and ambiguous inspection standards, coupled with the threat of criminal prosecution, have unnerved CSSA's firearms-dealer members throughout the state.

### *Colorado Federal Firearms Licensee Association*

109. The Colorado Federal Firearms Licensee Association (CFFLA) is a non-profit corporation that promotes the interests of Colorado's firearms dealers, gunsmiths, retailers, and manufacturers.

110. The association's members range from home-based dealers to large, well-known state retailers.

111. CFFLA was established in 2024, to unify Colorado's firearms dealers to address common challenges and to promote the industry's interests in the face of increased state-compliance burdens. The association believes that by doing so, it can serve its community and enhance safety for firearms owners and non-owners alike.

112. At filing, nearly 200 firearms dealers are members of CFFLA. The association is experiencing rapid growth in response to the increasing state regulatory burden on dealers.

113. Each of CFFLA's members is a federally licensed dealers, and most hold state dealer permits.

114. As FFLs, all CFFLA members are subject to periodic federal inspections by ATF.

115.   Also, some of CFFLA members are subject to inspections under the state's warrantless-inspection scheme.

*Impact of HB 26-1126 on CFFLA*

116.   CFFLA's members have expressed growing apprehension about HB 26-1126 and the impact that they expect it to have on them and their communities.

117.   Almost 70% of firearms dealers in Colorado operate as home-based businesses.[3] Many FFL owners conduct their firearms business as a side operation that supplements other employment. These owners are anxious about the unrestrained nature of HB 26-1126's warrantless-inspection scheme and the criminal penalties that may follow should owners fail to adhere to the state scheme.

118.   This concern is not limited to small firearms dealers. Large firearms retailers that are members of CFFLA are also concerned about HB 26-1126's arbitrary criteria and ad hoc nature.

119.   Based on feedback from its members, CFFLA is concerned that many of its members will shutter their businesses rather than subject themselves to the vagaries of HB 26-1126.

## How HB 26-1126 Harms Plaintiffs

120.   Pre-enforcement review of a legal scheme is appropriate where the statute restricts a party's constitutional rights and enforcement of that legal scheme is sufficiently imminent. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").

---

[3] *See Colorado Federal Firearms Licensee Association*, https://www.cffla.org/ (last visited June 12, 2026).

121. As to the Colorado Constitution's article II, section 7, Colorado courts recognize that the Colorado Constitution "provides greater protection than does the fourth amendment." *People v. Rister*, 803 P.2d 483, 489 (Colo. 1990).

122. In this action, the State of Colorado has already demonstrated its intent to enforce Colo. Rev. Stat. § 18-12-402(3), by conducting or scheduling inspections of all three dealer Plaintiffs within the last six months.

123. HB 26-1126's warrantless-inspection regime has injured and will continue to injure Plaintiffs. The statute directly regulates their businesses, subjects their records to inspection demands that may occur at any time and without limitation, and criminalizes noncompliance.

124. These are not hypothetical harms; they are concrete, particularized, and imminent injuries in fact that are directly traceable to the challenged statutory provisions and redressable by this Court.

125. The Supreme Court has recognized the propriety of facial challenges for Fourth Amendment violations. *See City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). Plaintiffs may bring pre-enforcement facial challenges to statutes authorizing warrantless searches where, as here, the statute's terms are clear and its application does not depend on speculative or fact-specific scenarios. *Id.* at 418.

126. The deficiencies in Colo. Rev. Stat. § 18-12-402(3), are structural: the statute lacks notice of regularity; it fails to limit time, place, and scope in *every* application—not merely in some hypothetical subset of cases. The warrantless-inspection regime injures Plaintiffs' constitutionally protected property and privacy interests in their business records—records that contain sensitive, personally identifying information about their customers, including names, addresses, and detailed transaction histories about their firearm purchases.

127.    The regime also injures Plaintiffs' customers, who face the prospect that their lawful firearms purchases will be surveilled without warrant protections, chilling the exercise of constitutionally protected rights. Absent a judgment declaring HB 26-1126's warrantless-inspection provisions unconstitutional and an injunction permanently enjoining their enforcement, Plaintiffs will continue to be subjected to unconstitutional searches and to face the threat of criminal prosecution for asserting their constitutional rights. Plaintiffs have no adequate remedy at law other than to file this lawsuit for prospective relief.

## Claims for Relief

### Claim 1
### Violation of the Fourth Amendment – 42 U.S.C. § 1983
*Against All Defendants*

128.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

129.    Plaintiffs are federally licensed and state-permitted firearms dealers under 18 U.S.C. § 923 and Colo. Rev. Stat. § 18-12-401.5, respectively.

130.    As such, Plaintiffs are subject to the warrantless-inspection scheme set forth by Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403.

131.    Plaintiffs face an imminent and credible threat of enforcement. Under Colo. Rev. Stat. § 18-12-402(3), their records must be made available for inspection "at all times." Under section 18-12-403, refusal to produce records upon request is a class 2 misdemeanor. Plaintiffs are thus forced into the untenable choice of submitting to unconstitutional, warrantless inspections or facing criminal prosecution—with no mechanism to seek judicial review before being compelled to comply. This is the type of coercive enforcement scheme that gives rise to a pre-enforcement facial challenge. *See Patel*, 576 U.S. at 415–18.

132.    The warrantless-search scheme in Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403 fails to provide a constitutionally adequate substitute for a warrant as required by *Burger*, for at least three reasons: (1) it fails to inform dealers of the regularity of inspections or establish any inspection schedule; (2) it authorizes an overbroad and undefined class of inspectors with no nexus to firearms regulation; and (3) it fails to limit the discretion of inspecting officers in time, place, scope, or manner. The statute thus mirrors the standardless inspection regimes the Tenth Circuit struck down in *V-1 Oil Co. v. Wyo. Dep't of Env't Quality*, 902 F.2d 1482, 1487 (10th Cir. 1990), and the Supreme Court invalidated in *Patel*, 576 U.S. 409.

133.    The Supreme Court has previously found that the firearms dealing industry qualifies as a "closely regulated" industry for purposes of the *Burger* framework. *See Patel*, 576 U.S. at 424. Even if the State satisfies *Burger*'s first prong—a substantial government interest in regulating firearms commerce—the State's warrantless-inspection scheme clearly fails the second and third prongs.

134.    As to the necessity of warrantless inspections to further the regulatory scheme, the need is greatly weakened by the existence of the comprehensive federal framework that already provides for periodic compliance inspections. *See* 18 U.S.C. § 923(g). The Tenth Circuit has held that warrantless searches are necessary in instances where business records may include records of stolen goods, *see S&S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 438 (10th Cir. 1991), and in cases involving inspections of commercial truckers, who rapidly transit the jurisdiction before a warrant may be obtained, *see United States v. Vasquez-Castillo*, 258 F.3d 1207, 1211 (10th Cir. 2001). Here, given the robust federal framework, the potential for routine inspections, and the fact that state inspectors may effectively achieve surprise

27

inspections through other means, *see Patel*, 576 U.S. at 427, warrantless inspections are unnecessary to further the regulatory scheme.

135.    As to *Burger*'s third prong—the requirement that the statute provide a constitutionally adequate substitute for a warrant—the state's warrantless-inspection scheme does not even try to comply with *Burger* and its progeny.

136.    Under *Burger*, the statute must "inform the commercial property owner that his property will be subject to periodic inspections undertaken for specific purposes." *V-1 Oil*, 902 F.2d at 1487 (citing *Burger*, 482 U.S. at 703). HB 26-1126 does the opposite: it states only that records must be available "at all times." This language contemplates inspections that may occur at any moment, without pattern, without schedule, and without limitation, which is precisely the type of "'random, infrequent, or unpredictable'" inspection that the court found unconstitutional in *V-1 Oil*. 902 F.2d at 1487 (quoting *Donovan v. Dewey*, 452 U.S. 594, 599 (1981)). Unlike the federal statute, which gives dealers notice that compliance inspections will occur no more than once in any 12-month period absent narrow circumstances, 18 U.S.C. § 923(g)(1)(B)(ii)(I), Colorado's statute provides no notice of regularity whatsoever.

137.    Statutes authorizing warrantless searches must notify business owners about "who is authorized to conduct the inspection." *Burger*, 482 U.S. at 711.

138.    Colo. Rev. Stat. § 18-12-402(3) fails this requirement. Instead, it invites an overbroad set of peace officers, including lottery investigators, port of entry officers, state student loan investigators, and liquor license inspectors, to conduct inspections on firearms dealers. Such broad authorization provides no meaningful notice; dealers are still unsure who will show up and demand to inspect their records.

139.    Colo. Rev. Stat. § 18-12-402(3) places no limitations on the time, place, and scope of the inspection that peace officers may conduct.

140.    The statute expressly obligates dealers to make their records "available at all times." The statute does not require peace officers to conduct their inspections during business hours; instead, it permits peace officers to demand inspections of dealers—without prior notice—at any time, day or night, regardless of whether the business is open or closed.

141.    Further, the statute sets no frequency limitation on peace officer inspections. Instead, peace officers may inspect a dealer as often as they please, without prior notice, and without coordinating their inspections with other peace officers or the state agency with regulatory authority over firearms dealers.

142.    Colo. Rev. Stat. § 18-12-402(3), also does not identify the location at which the inspection must occur. Presumably, the inspection may occur at the dealer's business, but nothing in the statute prohibits inspectors from demanding inspections in other, less convenient, locations.

143.    Colo. Rev. Stat. § 18-12-402(3), fails to limit the purposes for which a state inspector may review dealers' records. The statute thus permits inspectors to conduct warrantless searches of dealers' records for any reason the official fancies.

144.    In addition to burdening dealers, Colo. Rev. Stat. § 18-12-402(3) grants an extensive and arbitrary set of state officials the ability to review and collect vast amounts of private information on everyday citizens while foregoing the rigors of obtaining a warrant. The scheme threatens to expose vast amounts of private information concerning firearms customers—everyday citizens—to unconsented inspection and collection by an extensive and arbitrary set of state officials who may then use such information for purposes unrelated to regulatory compliance. The scheme offers private individuals no way to shield their personal information from unreasonable searches.

145. Dealers who refuse to consent to a peace officer's inspection demand, though it may be unreasonable and violate the Constitution, face criminal prosecution for committing a class 2 misdemeanor. *See* Colo. Rev. Stat. § 18-12-403. This punitive enforcement mechanism forces dealers to choose between complying with unconstitutional inspections or facing criminal prosecution.

146. Given the lack of limitations on inspection regularity and scope, as well as the failure to constrain inspecting officers' discretion regarding inspections, the warrantless search scheme of Colo. Rev. Stat. § 18-12-402(3) fails the *Burger* warrantless-inspection requirements.

147. Firearms dealers in Colorado have no other remedy through which they can prevent or minimize irreparable harm to their Fourth Amendment rights than to file this lawsuit.

148. Therefore, Plaintiffs file this action to enjoin the enforcement of the portions of Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403 that, as described above, constitute violations of the Fourth Amendment.

**Claim 2**
**Declaratory Judgment – 28 U.S.C. § 2201**
*Against All Defendants*

149. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

150. An actual, justiciable controversy exists between the dealers and Defendants regarding the state's infringement on dealers' rights under the Fourth Amendment of the U.S. Constitution and under article II, section 7 of the Colorado Constitution.

151. A declaration of the parties' rights is necessary and appropriate to resolve the controversy. Without a declaration, the dealers will face a substantial

violation of their constitutional right to be safe from arbitrary and unreasonable warrantless searches.

152.    Therefore, Plaintiffs seek a declaration that the warrantless-inspection provisions of Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403, are invalid under the U.S. Constitution as a violation of the Fourth Amendment and under the Colorado Constitution as a violation of article II, section 7.

**Claim 3**
**Violation of Article II, Section 7 of the Colorado Constitution**
*Against All Defendants*

153.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

154.    Article II, section 7 of the Colorado Constitution provides: "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be; nor without probable cause, supported by oath or affirmation reduced to writing."

155.    The Colorado Supreme Court has interpreted article II, section 7 as providing privacy protections broader than those afforded by the Fourth Amendment. *See People v. Sporleder*, 666 P.2d 135, 140 (Colo. 1983); *see also Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1056 (Colo. 2002) (holding that Colorado officials must demonstrate a "more substantial justification" than the Fourth Amendment requires in order to obtain customer purchase information through a business record search). Under these holdings, the privacy interests of both firearms dealers and their customers receive greater protection under the Colorado Constitution than under the Fourth Amendment.

31

156.    HB 26-1126's warrantless-inspection regime violates article II, section 7 for the same reasons it violates the Fourth Amendment, and additionally because Colorado's enhanced constitutional protections demand even greater constraints on government intrusion into the private records of dealers and their customers. The standardless inspection scheme authorized by Colo. Rev. Stat. § 18-12-402(3), is unreasonable under the Colorado Constitution.

157.    The state's warrantless-inspection scheme has violated and will continue to violate Plaintiffs' rights under article II, section 7 of the Colorado Constitution unless this Court declares the regime unconstitutional and permanently enjoins its enforcement.

## Relief Requested

WHEREFORE, Plaintiffs seek:

A.    Entry of permanent injunctive relief enjoining Defendants from enforcing or directing the enforcement of the inspection and penalty provisions of Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403, against Plaintiffs and the members of Plaintiffs CSSA and CFFLA;

B.    Declaratory judgment declaring that the inspection and penalty provisions of Colo. Rev. Stat. §§ 18-12-402(2)–(3) and -403, are unconstitutional under the Fourth Amendment of the U.S. Constitution and under article II, section 7 of the Colorado Constitution, on their face and as applied to Plaintiffs and all others similarly situated;

C.    Reasonable costs and attorneys' fees under 42 U.S.C. § 1988;

D.    Such other relief as may be appropriate.

Dated: June 12, 2026.                    Respectfully submitted,


                                          *s/ Julian R. Ellis, Jr.*
                                          Julian R. Ellis, Jr.
                                          Robert J. Bucknam
                                          First & Fourteenth PLLC
                                          2 N. Cascade Ave., Suite 1430
                                          Colorado Springs, CO 80903
                                          Phone: (719) 428-4937
                                          Email: julian@first-fourteenth.com
                                                  rob@first-fourteenth.com

                                          Michael Francisco
                                          First & Fourteenth PLLC
                                          800 Connecticut Avenue, Suite 300
                                          Washington, D.C. 20006
                                          Phone: (202) 784-0522
                                          Email: michael@first-fourteenth.com

                                          *Attorneys for Plaintiffs*